Okay, we're ready to proceed. You have five minutes. May it please the Court. My name is John Froyen. I represent the Easton Area School District in this matter. Your Honor, I would respectfully request five minutes of rebuttal time. All right. Your Honors, when this case first came into my office, I could not help but think that this was just another trivial issue that occurred in the day-to-day life of a public school solicitor. Since the case has developed through the district court proceedings, through proceedings in this court, I've come to understand that rather than, as some suggest, that this is not a case that should be dismissed as a school district's overreaction to an acute or silly phrase. The analytical underpinnings of this case have significant ramifications for public school educators to encourage and preserve decorum in the schools and the civility of discourse in the classroom. The district court's treatment of the constitutional issues raised threatens to open the school gates to a flood of cause-based marketing energized by clever sexual double entendre that pushes the limits of propriety in public schools  There are a few points, Your Honors, that I think are uppermost in at least our consideration and we submit for your consideration in reviewing this case. The most important thing to remember is what this is. This is a dress code violation. It's a dress code that provides as many, most, or perhaps all dress codes applicable to the middle schools would prohibit attire or accessories that contain sexual double entendre. This, we believe, is all fitting and appropriate, particularly in a middle school environment or indeed for any public school environment. This court has recognized that, as well as other federal courts, have recognized that restraint should be exercised when considering issues within the purview of public school officials, particularly when those that exercise a judgment is contained within the school environment itself. And in this case, there's no question about this. This is something that happened entirely in school and there is no issue about outside expression. We believe that, in fact, this is a major flaw of the district court's opinion, is the court's utter failure to give the due discretion to the principal, who's sitting here today listening to how this is ultimately going to come out, in making a decision as to whether or not something was appropriate for that environment. School officials should not be put to the task of supplying case citations if they are acting reasonably. And I don't believe that the district court did that. While a ban, in this case, we believe to be justified under Tinker, we think that this case is really 100% decidable under Fraser. There is no argument of viewpoint discrimination here. Recall the irony of the circumstances here is that these violations were, in fact, committed on Breast Cancer Awareness Day. We had an entire school full of T-shirts with breast cancer T-shirts on, kids wearing pink ribbons and so forth. And, indeed, the record reflects that the assistant principal, on the first day that the kids involved here were admonished not to wear the bracelets, the assistant principal Braxmeyer asked them, is there another way you can do this? This is not a viewpoint discrimination case. Fraser, as you all know, protects schools, preserves schools' ability to regulate the manner of speech. And that's what we're talking about here, the manner of speech. We're not talking about suppressing the message. It does not follow, however, that simply because the use of an offensive form or expression may not be prohibited to adults, making what the speaker considers a political point, that same latitude must be permitted to children in public schools. And we think that this is a point that has been made again and again by the courts. The glib phrase that's been used a number of times is that students may wear The young girls who did this, who brought us here today, their mission was to remove the stigma of breasts, to try to get young kids comfortable in self-examination, and to remove the very stigma, the double entendre that you seem to be reading into the message. Where is the double entendre? Boobies or breasts? Where's the double meaning to that? I love boobies. Right. What is the double entendre there? Well, I think it certainly suggests to me, Your Honor, I love my boobies. Oh, I'm sorry. I think I suggest your chuckle is less mature than the conduct of the kids here. I'm sorry, Your Honor. I suggest your chuckle is less mature than the conduct of these two or three young kids here. They were trying to get us to a point where there could be an intelligent discussion about this message. There's clearly been a discussion. I mean, they've clearly succeeded in Your Honor, that's why I say I have a great deal of difficulty with the district courts really ignoring the context here. Mr. Freund, is the double entendre Double entendre, yes. Is the double entendre the use of the phrase to convey by your interpretation of it either the message within the context of breast cancer awareness week or instead sexual innuendo implying the desire of breasts for some sexual purpose. Is that the double entendre? Yes, the double entendre. Let me ask you this. Let me ask you this. You have said that your position is based on Frazier, the district court used a rationale that was both Frazier based and Tinker based. Aren't you really asking us to extend Frazier in two ways? That is, to reach speech that is not plainly indecent and that's a word from Frazier plainly, but only ambiguously indecent and secondly, to reach speech on matters of public concern. Isn't that really the extension you're seeking here? I don't believe so, Your Honor. I think if you look at the Frazier case itself as well as a number of cases that we have cited that you don't need obscene or profane speech in order to come within the ambit of Frazier. In fact, if you look at Frazier itself, Frazier does not utter one four-letter word. It's all contextual. All right, I understand that, but let's take it an additional step. What about the import of Morse to what our analysis should be and your position? Doesn't the reasoning in Morse, and by that I mean the reasoning as we must take it from Justice Alito's concurrence, because he's the fifth vote on that divided court. Doesn't the reasoning in Morse compel us not to extend the Frazier principle or the Frazier holy to speech that can plausibly be interpreted as commenting on a matter of public concern? That's true, Your Honor. Judge Alito does say that. And don't you agree that part of the double entendre that you suggest is a matter of public concern, the breast cancer awareness? I do, Your Honor, but again, we go back to whether or not schools are allowed under the Constitution to regulate the manner of speech, not so much the message. If you take just this one phrase, and I think that on the scale of what kind of double entendre could be contained in these bracelets, that boobies is really on the innocuous side. In fact, there have been a scat of I heart, all kinds of body parts for all kinds of diseases that have come down that are going to beg the same analysis. Respectfully, I don't believe that fact-based response answers my doctrinal question about the import of Morse to the Frazier use that you seek to make here. Your Honor, in Morse, the course... Alito's language that we've got to use to narrow that opinion. Right, but in the Morse case, the question was viewpoint preclusion. There's no viewpoint preclusion here. In fact, the message was endorsed by the school. The message was celebrated by the school. This is merely a matter of, in a middle school setting, not pointing to who are using acute titillizing and no pun intended phrases in order to get the attention and distraction of the kids to a particular message. So had they said... More difficult, the school itself talked about having passionately pink day. So it, on its own, was engaging in some titillating language. Following up on Judge Smith's comment, wouldn't we extend Frazier even further because there it was a school-sponsored assembly with a captive audience with children who were reacting to it, some bewildered, embarrassed. Here we have a bracelet on someone's wrist. It could have easily been a T-shirt, Your Honor. But it wasn't. It's a bracelet. Yeah, but it could have been a T-shirt. Well, if it's a T-shirt, then it's very much like tinker as well, like an armband. And you say that it is a double entendre, but Frazier really was about lewd, obscene, offensive language used in a school assembly. This is different. Your Honor, I beg to differ with you. I don't think that Frazier said anything. If you look at it word by word, which we're not encouraging here, but if you look at it word by word, if you took the same analysis that Judge McLaughlin did, take an etymological approach of each word and analyze it, Frazier didn't say any bad words. No, but it's contextual. You said yourself it's all, using your phrase, it's all contextual. The student in Frazier knew that what he was doing was lewd. He was told beforehand by the two teachers to whom he consulted not to do it. It could have grave consequences. And he admitted that he did it because it was so distasteful. He admitted that after the incident. And here we have a situation where the whole problem is the word boobies. I'm assuming had the bracelet said, and there was some dispute about this because of the shifting positions of the principals here, had the bracelet said, I love breasts, would you have the same problem with the bracelet? Perhaps. Perhaps in a middle school setting. I thought that one of your administrators ultimately testified that breasts, or the use of that word, would not be a problem. I think he said that it would. He said it would with a change of mind. Yes, there was a change in the course of his testimony, I think from the deposition to some later testimony. I guess the question is it might or it might not be a problem. In fact, that's one of the difficulties that we have with the district court's opinion. I still have trouble finding why if breast is not a problem, what makes boobies a big problem? I mean, the program, the people that are involved in this cancer awareness program wanted to target the younger, the teen, the pre-teen students. This is the language that they used. Hallways, the locker room, the classroom. How can that be offensive? Breast is not. I think that Morse makes very clear that it's not the intention of the speaker here that's to be analyzed. It's how the words are perceived. Perceived by whom? Should it be the perception of the least mature, the most troublesome member of the audience? Say you have someone who is basically out to have himself or herself the center of attention. He's going to seize on every opportunity he or she gets. Is that the person's perception that we should use to judge? Your Honor, these are seventh grade boys. They're seventh grade boys. If you look at our brief, there is a, in our brief, as part of our argument, I abstracted a letter from a teacher from the Morning Call newspaper that made the point that when she tried to teach the poem about the snow on the breast of the early morning snow or something like that, all hell broke loose in her thoughts. Well, that's exactly what these two young girls are trying to get past. We're saying, look, let's get a grip here, folks, that breasts are part of our bodies. We need to take them seriously. We need to get the taboo out of our boobs, our breasts, our mammograms, whatever. That's exactly the point here. That's exactly what these two young girls are trying to get us past. I guess the problem is, Your Honor, if schools cannot prohibit sexual innuendo on the basis that it's used to bring attention to some good cause, how are they going to deal with some of these other more lewd body parts? Well, when those lewd body parts are banned, I assume that the case will work its way into the court and we can address the particular context, to use your word, of the expression. But that's the very point, Your Honor, is that these cases should not have to be analyzed on an etymological basis, part by part, broken down into constituent parts, that the school officials need some latitude. Your position would allow the school to ban any message that anyone could forcibly interpret as being lewd or disruptive. That's where your argument takes us. Could we ban any message that's lewd or disruptive? Well, I think under the case law we could. That the school foresees, forget reasonably, if the school foresees the message as being lewd or disruptive, it can be banned. There goes Tinker's armband out the window. I disagree, Your Honor. The record in this case shows that the decision to ban these bracelets was not made until there were a couple of complaints. The complaints were two months after they'd been worn. The formal communication to stop wearing the bracelets was two months after August 30th, the first day of school. That's possible. It's possible, it's fact. I understand your policy position, but I'm still, frankly, trying to understand your legal position. And I will concede that while my colleagues may well be able to find a coherence in the Supreme Court's school speech cases, some of it has eluded me, which is why I'm trying to work with Tinker, with Frazier, and with Morris. And I have understood your position to be, at the very least, that what we had here was a double entendre. Yes. And we agree on that. Yes. We can agree that's your position. Isn't it the nature of a double entendre to be ambiguous? And I use that term only because a double entendre is, by definition, susceptible to two different meanings. Is that right? That's correct, Your Honor. All right, if that's the case, I don't understand why you would not see some clarity in a rule and some direction to school administrators in a rule that says that speech that is ambiguously lewd, vulgar, or indecent, cannot be, at a minimum, categorically unprotected if it could plausibly be interpreted as commenting on a political or social issue. That if it's commenting on a political or social issue, even if ambiguous, even if a double entendre, that takes it into the realm of protection and administrators should not be permitted to exclude it. Doesn't that provide some direction? I don't think it does, Your Honor. I think that does not. If you look at the number of cases that we've cited, we couldn't actually find a single case except for this one, in which a federal court has not upheld a school's regulation of a message, notwithstanding the purpose of the message, where there was a double entendre that was either sexual or dealt with drugs. The Bossert case, the Pyle case. How many of those cases came after Morse? None of them. But, Your Honor, I don't think that Morse informs the situation at all. This is purely a Frazer case. I understand that Morse doesn't discuss Frazer, but it came down to a completely different reason. It had to do with the mission of the school. This is not Morse. This case is simply trying to avoid throwing a match into a cauldron of boiling hormones. Isn't your best argument in response to Judge Smith's questioning on whether he is set for a test that works, that you can't look at the ambiguous meaning of a particular phrase? That's why you're concerned with feel-my-balls and all of the other parade of horribles that could come before a school district, because if they did, that's where you'd – if you applied the speech that is ambiguous, you'd have to permit all of those into the school district. Your Honor, I understand. I understand what you're saying. I understand what Judge Smith is saying. But here, we talk about ambiguity, but there really is no ambiguity about the meaning here. You know, I just commend the audience to you. I commend the fact that this – there was a Playboy article about this. In the testimony at the preliminary hearing, the testimony from the I Keep a Breast people was the effect that porn stars inquired about this. There is no ambiguity in what this means. Well, the fact that there's no ambiguity goes back to my point about the double entendre being absent. Everybody knew what was involved here. You can say double entendre in the theoretical context, fine, but I agree with you that everybody agreed what the meaning was here. The girls were trying to communicate a message about maintaining breast health and breast safety and getting us past the kind of discussion that we're being pulled down into today. And, Your Honor, Mr. Frederick in Morse was just talking gibberish, too, and the court said it doesn't matter what the intent was. What was the factual finding in Frazer from the district court as to what Matthew Frazer's intent was in making a political speech to nominate his friend Jeff Coleman? He did intend to titillate the audience, yes, but he was trying to get his friend elected. That was the purpose of the speech? It was a political speech? Yes. Well, in politics, in a micro-political kind of way, yes. He was trying to get his friend elected to office. Do you remember out of the 600 in attendance, what was the factual finding as to how many students reacted in a sexually explicit way? My recollection is that there were a few who made finger gestures and so forth. I mean, it did not deteriorate the fabric of the educational institution. Your point is that the purpose of the speech plays no role in whether the school can ban speech? In other words, raise cancer awareness, as is the case here? I say the intent of the speaker, or the fact that this message was given in a way that satisfied the speakers with regard to whether or not they are communicating their message, is not the measure. And that's exactly what Morris talked about. Let's get Morris out of the discussion. Morris was a student advocating drug use. I don't think anybody on this court would have any problem saying that a school can prohibit student speech which advocates the use of illegal drugs. That's not what we're talking about here. So let's get Morris out of this. It's either Frazier or Tinker. Morris has nothing to do with this case. We're not talking about bong hits for Jesus. We're talking about whether or not the kind of speech here is akin to pure speech, is what the court said about the black armbands in Tinker. And I'm heart-placed to find out why this kind of message, although it's an act, is not precariously close to pure speech. Now, you mentioned double entendre. Then you came back and said there's no doubt about the meaning. I agree with you there's no doubt about the meaning. The meaning is some young kids trying to educate their peers, again, to get them past the point of this discussion that we're mired into, to get them to take bodily health seriously, appreciate their breasts, breast health, engage in self-examination. That's the point of this. Right, Your Honor. And they were not prohibited from doing that. What they said, and actually, if you look at the record, their purpose changed, too. Their testimony was originally that they bought these things because all their friends had them. So their original intent differed somewhat, too. Mr. Coyne, you've said repeatedly it doesn't make any difference what their purpose was, right? For the purpose of the constitutional analysis, yes. I would have thought that your main argument in response to Judge McKee's assertion that if somebody starts wearing the Feel My Balls bracelet to school, then you can bring that case to court. I would have thought your argument in response to that would be that's the whole idea here. We shouldn't have to come before 12 or 14 federal judges and banks to decide what can and can't appropriately be worn in school. Well, thank you, Your Honor. I thought I did say that. That is my argument. That is my argument. And one of the things that I tried to say was that one of the problems that we have with the district court opinion, and I think an error that was made here, is that absolutely no discretion was given whatsoever to the reasonable decision of the principal. Instead, what the judge did was she took word by word and analyzed it and said, oh, boobie could be a word, boobie could be this, and then came up with the almost incredible, really unbelievable conclusion that there is, it's totally unreasonable to say that this was, that there was a sexual entendre here. Where, in fact, everyone here is. Let me ask you this question that follows up on what Judge McKee has been asking you. Suppose you substitute what we could all agree, but I won't reiterate, is an objectionable synonym of breasts. Okay? Whatever you have in mind is fine. So it's I heart whatever that word may be. It's been suggested that since the aim would be innocuous, it's breast cancer, that it should be permissible. Would you agree with that proposition? And if you disagreed with it, why would you disagree with the proposition? Okay, I'm not sure that I completely understood what your point was. But do I. All right. You're not alone. Oh, okay. Yeah, you tell us how to answer the question once you understand the question. Go ahead. Suppose you use one of the seven objectionable words, right? And there is a word that begins with a T that is a synonym for breasts. Okay? So we can be clear. So the phrase is now I heart that T word keep abreast. Is that an objectionable under your analysis? You mean if they add the phrase keep abreast? Well, you've got some time. Yeah. He's got five minutes on rebuttal. Maybe he can think about it. Maybe it will crystallize and come back on rebuttal and take it up. Let's put her off until. Okay. You get the first question on rebuttal. Judge Rick, anything? No, I've been listening. I don't have any questions. Okay. Thank you very much. Thank you. That's where I'm at. May it please the court. I'm Mary Catherine Roper here for the plaintiffs, and I'm accompanied by the plaintiffs Kayla Martinez and Brianna Hawka, who are sitting with my co-counsel, Mr. Volchek. The Supreme Court has used the strongest language to describe the importance of student speech in schools. It says the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. You're talking very fast. I will slow down, Your Honor. Thank you very much. It is a fault of mine. Because this is so important, a school cannot censor student speech unless it can show that its action was caused by something other than a mere desire to avoid discomfort or unpleasantness. In most instances, that means a showing of substantial material disruption or a reasonable forecast of substantial material disruption. Yeah, but doesn't it depend? Two or five minutes more. I think the record in this case amply illustrates that that standard is not met. So instead, the school district relies upon Bethel v. Fraser, which allows the school to censor speech that offends for the same reason that obscenity offends. Now, the school district contends that Judge McLaughlin should have deferred to the district's determination that the phrase, I heart boobies conveys a lewd reference to women's breasts,  is always present with the phrase, I keep a breast on a rubber recognizable cause bracelet, and was worn by girls who in this case invariably talked about it in the context of breast cancer awareness. And the Supreme Court, it is true, has emphasized the importance of deference to school officials. But there is no reason for deference to a determination that was not made. Judge McLaughlin found that the district officials here manufactured a post hoc sexual interpretation of the bracelets as an excuse for censoring language that caused them discomfort. The First Amendment never requires the courts to defer to post hoc excuses for illegitimate censorship. That finding alone supports Judge McLaughlin's determination that plaintiffs are likely to proceed on the merits of their First Amendment claim. But if this court disagrees with Judge McLaughlin and finds that the district officials have genuinely believed that these bracelets conveyed a message of sexual attraction to breasts, then the question remains whether that was a reasonable determination by the school officials. Judge McLaughlin properly looked to Morsi Frederick for a framework to addressing the reasonableness of an interpretation of ambiguous speech. And that framework, frankly, mirrors what this court has done in the tinker realm. This is an issue of first impression, so we have to look for tests and approaches in similar contexts. In Sapniewski v. Warren Hills, this court did not defer to school officials' fears about the word redneck on a T-shirt, but held that the proper analysis had to deal with the reality of the school environment. We think the proper analysis always has to deal with the facts and circumstances. There can be no more deference when exercising censorship under Fraser than there is when exercising censorship under Tinker or under Morse or under any other First Amendment rubric. We think it's helpful to look at, again, to borrow from another context since this is an issue of first impression, to look at how the courts can determine the meaning of speech that is alleged to be a matter of public concern. They look at content, form, and context. In this case, the content is, I heart boobies, keep abreast. The form is a recognizable cause bracelet. And the context is something everyone recognized as a breast cancer awareness discussion. That's how it was presented. That's how it was understood. And it is, of course, acknowledged by everyone, including the administrators that this touched on a matter of public concern. Now the school district's point is that you should not look at how the language was interpreted or understood in schools, but you should ask how that language could have been interpreted in some other context, in Playboy, on websites that cater to adults. Those aren't the questions. The questions are what happened and what is appropriate in the Eastern District Middle School. And all of the evidence of record is that in that context. Time's up now. I would just, the only question, isn't it something that you have to really consider the level of the school? One thing, it would be one thing if you're in high school, something else if you were in third grade. Now you're sort of in the middle here and doesn't that give the school, I mean, wouldn't you expect that the school might have more of a authoritative standing, the authorities, the lower the grade? Suppose for example, this happened in the fourth grade. What would the argument be? Well, Your Honor, in the absence of evidence of what actually happened in this school, the age of the students would be a significant factor in deciding whether school officials had reasonably predicted that this was going to be taken as a lewd statement. But when we have evidence as to what the students actually discussed and how the students actually reacted to it, anyone's supposition about how the students would react cannot overcome that evidence. Yeah, but we live in a real world. Middle student school, middle students do not talk about girls' arms and noses, but they do talk about breasts. And it's a question, and they talk in a sexual way. And that was the, so wouldn't it be objectionable, reasonable standard here? And that was just what was bothering me about it. Yes, Your Honor. We think that the First Amendment requires schools to punish the students who misuse words rather than silence the students who use them properly. So in Frazier, they should have just punished the three students who made, three out of 600 made lewd gestures. So why didn't they just punish those three students? Your Honor, while one teacher said she saw three students make lewd gestures, it was clear that the general understanding of the students was that the speech was not just about Jeff Coleman. And why did the district court find to the contrary? The district court and the Ninth Circuit in Frazier both ruled in favor of Frazier. And in fact, the assembly was not ceased. There was no timeout called. Correct me if I'm wrong, but my understanding of the facts are that Mr. Frazier was a two-time state debate champion, that he wanted to get his friend elected. He made a political speech and his testimony and a factual finding of the district court was that his intent was to create a rapport with his fellow students and to amuse them and to get Mr. Coleman elected. He spoke, there was no stoppage. Mr. Coleman spoke, there was no punishment. The next morning they came to school and then there was a problem. Is that a correct recap of the facts in Frazier? Your Honor, my understanding of why the district court and the circuit court ruled in favor of Mr. Frazier is that they were operating under Tinker and there was not yet an early, lewd, vulgar, sexual innuendo, double entendre carve out to Tinker yet. Exactly. Frazier gave us that. Exactly. And that's why this is, I think you and opposing counsel are quite correct. This is a Frazier case and we've got to analyze it under Frazier, not under the Hazelwood versus Kuhlmeyer carve out or the Morris v. Frederick carve out. This is a Frazier case, right? It is Frazier as narrowed by Morris. How does Morris narrow Frazier? Do you see Tinker as the law and Frazier, Hazelwood and Morris as the exceptions? Your Honor, they are, they are all the law, right? I mean, we have a first amendment that says. Do you see Tinker as the standard? Do you see Tinker as the standard for gauging student speech and Frazier, Hazelwood and Morris as the exceptions? Certainly, Your Honor, this court has said that Tinker is the default standard for student speech. I didn't ask you what this court said. I'm asking you how you view it. Yes, Your Honor, we agree with this court that Tinker is the default standard, but there are circumstances in which Tinker does not apply. Do you believe that Morris has absolutely no application to this case? Should we, for purposes of this case, ignore the language that I quoted to your adversary a while ago from the Alito concurrence, which I look to only because he's the fifth vote, that we should not clearly regard as unprotected speech, that can plausibly be interpreted as commenting on any political or social issue? Your Honor, we agree that that is relevant, as well as the fact that the court did not automatically defer to the school officials reading of the language, but conducted an inquiry into the facts and circumstances to see whether that was a reasonable reading of the language. In addition, of course, the reasonable reading of the language being the socialist, being the complete message conveyed by the presence of all of the words on this gauze bracelet in the context in which they were delivered. These are not words appearing on a tight T-shirt, right? What if, go back to Mr. Freud's point, Freud's point, what if it was on a T-shirt? What if I heart boobies, I love breasts, whatever the message is, is on a T-shirt or a banner in front of the school as the students come in in the morning? Would that change your analysis? Of course it changes the analysis, Your Honor. We believe that the school officials must always take into account the context in which speech is uttered, as well as, and that means the words themselves, the form in which they are presented, and the surrounding context. What makes this better from your standpoint is that it was on a small bracelet as opposed to on a T-shirt? The entire context is what matters, Your Honor. I don't think there's any one factor that outweighs everything else, but anyone who looks at this situation says, oh, these girls were wearing breast cancer awareness bracelets. Then there's a second question. His question is, is it any different? That's the question. And I've said it's always different. Yeah, but suppose if a student wore it on a T-shirt, it would hammer the message home better. So how could, and yet if I understood your innuendo, they might be able to control that, but not the bracelet. And yet if it's such a benign message without any issues involving it that are questionable, why shouldn't they be allowed to wear it where it can be seen better? You can't see too well on a bracelet. Your Honor, even these bracelets could be misused, right? Some girl or boy could walk around saying, I love boobies. That's what happened here, right, with the fireball candies. There was one incident that was reported after the ban. It had nothing to do with the ban, Your Honor. And I think that you do not define the First Amendment rights of the entire class by the worst behavior of one student in that class. Isn't it clear, though, that you can't credibly argue that the only message that a school administrator would anticipate a middle school student taking away from this bracelet, the only message is let's fight breast cancer? Your Honor, my response is always grounded in this record, which is how Judge McLaughlin made her decision. And in this record, there is no evidence that before the ban, anyone had suggested that anyone was using these bracelets in a lewd fashion. Judge Hageman asked a question a while ago he never got an answer to, and that was, you started to answer it and got cut off. How does Morse narrow the standard? And you started to answer it and you got cut off. Maybe you could address that. So in several ways, right. So Morse, the opinion by Chief Justice Roberts, of course, says we are not going to interpret Fraser as anything that's objectionable because we don't want to get anywhere near religious or political speech. Justice Alito, of course, makes that far more explicit and says, I do not see this reading as anything that says we're going to ban socially important speech that's commenting on political issues. And so Judge Smith has suggested a potential test that says, when you have ambiguous speech, I think you mean speech that's close to the line, you're going to look at that to see whether it touches on a matter of public concern. And if it does, then that accords most First Amendment, more First Amendment protection. Political election is not a matter of public concern. I doubt that wanting to get your friend elected is going to qualify as the kind of public concern talking about political and social issues. I would like to hear Ms. Roper finish her answer. I think that's not what Justice Alito was talking about. And he also wasn't talking about frank profanity, right? Even he, in Sachs, draws the distinction between Tinker's armband and Cohen's jacket. But when we have a message that is about social and political issues that is the fact that someone could dream up another message that the speakers are not attempting to convey should not take away their First Amendment right to speak. Let me ask you this. It's the intent of the speaker. You want us to apply a subjective test that it's the intent of the speaker. It's not what the objectively reasonable observer would have. No, Your Honor, I don't suppose a subjective test at all. The question of whether something is a matter of public concern is ably dealt with by this Court and many others in an objective test. Back to my question. Why was it Fraser made a political speech? I thought schools had student body governments and student body elections as a way to inculcate civics and to teach students about becoming future representatives of government. Is that not core political speech? Your Honor, I think we can distinguish between his intent, which was to engage his fellow students, and his message, which had nothing to do with public concern, but was pure sexual metaphor. Who says? I mean, isn't that something the Supreme Court just decided in Fraser? I didn't see anything in the record from the District Court or the Ninth Circuit that supports a factual finding here, that his intent was just to give everyone a lewd laugh. Rather, the record indicated his intent was to elect Jeff Coleman. And to amuse, as the Court says, his fellow students. He also made quite clear that his intent was to use lewdness in order to accomplish those things. Where is that in the record? It is. I'll have that for you. We did, Your Honor. The Supreme Court was 679. Thank you. Thank you. Could the same be said for the bracelets? I mean, I thought that the Keep a Breast Foundation was pretty explicit about saying we selected this phrase because it is the sort of phrase that will catch a person's attention. They didn't select keep a breast as a separate phrase. They selected I heart boobies because it has a secondary meaning. Some might even say a primary meaning, and that the breast awareness piece is a rider on the sexual innuendo. How is that? I mean, am I wrong about the record on that? No, in fact, the testimony is exactly opposite that. The testimony from the KAB representative is that they chose I heart boobies in order to convey a message of love, self-love, to use words that were juvenile and informal and familiar to the young audience. Frankly, they weren't trying to appeal to me. They were trying to appeal to our plaintiffs in language that they would find familiar and not threatening, and they used the I heart rubric because that is so easily associated with love and affinity, not at all because of any effort. They disclaimed entirely, explicitly, and repeatedly any effort to trade on titillation. And they were surprised when porn stars and truck stop restroom operators and other places approached them and said, hey, this has a sexual message we'd like to use this to. Is it really the position of your client that there's a surprise, that this has a sexual element to it? I think that that was exactly the testimony of the KAB representative, which Judge McLaughlin credited as credible. They did not say, by the way, that they rejected truck stops and vending machines because those were sexual outlets, but because those were outlets where the message could not be controlled, and they were very concerned about controlling the message. May I just give the citation to Judge Hardiman? At page 678 of the Supreme Court's decision in Fraser, it says he admitted to having given the speech described and that he deliberately used sexual innuendo in the speech. Your Honor, I'm not talking about intent, but meaning. Meaning is what matters. What is the best analysis when speech is clearly vulgar, it's indecent, but it's also strongly political and social? Something that would give them some discretion so the school board can act. Sounds like line drawing, and you wonder how the school boards are supposed to address these issues. Your Honor, the schools have been drawing lines and doing investigations and occasionally being corrected by the courts since the decision in Tinker. Certainly, I think we would not disagree with the original premise, which is that Tinker gives students the right to wear the armband, but not Mr. Cohen's jacket. That is not only a word that's identified as being not permissible on the public airwaves. The testicular cancer awareness campaign that was alluded to by your adversary, problematic from your standpoint? I presume you'd endorse it. Your Honor, if we're talking about a bracelet that says, feel my balls, which suggests one person touching another person's genitalia, it would take a lot of context to remove the potentially sexual meaning in that. The same inherent meaning is not in I love my body, which is what these bracelets say. Now, on those, isn't there a tagline similar to keep abreast, which is testicular cancer awareness? There's no evidence in the record about those bracelets, Your Honor. I have no idea. Judge Fischer, I had a question a while ago. Do you remember what it was? I'm sorry. I do remember what it was. I was concerned and continue to be concerned as to whether or not you think the district court used the right test when it looked at the motivations of the speakers as opposed to looking at whether or not the school board's decision was objectively reasonable. As I mentioned, Your Honor, this is an issue of first impression, so we're all feeling our way. I do not think that the focus on intent was the right approach, but I think that Judge McLaughlin's thorough review of the findings and the context do nonetheless support her findings with respect to the ultimate question, which she got right, which is, was the post hoc reading of these bracelets as sexual double entendre, first of all, a genuine one, and secondly, a reasonable one. Let me ask you this question. Suppose you substituted for boobies some other objectionable synonym as it regards to a description of breasts. Would that be problematic from your standpoint? The context would be the same. The message would be the same. Would that give you pause as you argue this case? Your Honor, if there were a frankly objectionable word that were used, and again, I'll just use the example of Cohen's jacket, while it doesn't have the same shock value it had then, I think everybody agrees that the language of that jacket is something that would be viewed as offensive and frankly offensive. I'm going to interrupt you and beg your pardon, because that's not a particularly good analogy for what I'm asking you, so let me sort of steer you, if I may. I want you to use a substitute, any substitute that you'd like, that you think might be an objectionable synonym to breasts. Insert that for boobies. Now do you have a problem? I believe, I think we believe, that there is a level of frank lewdness that the schools can prohibit, even when it is offered as part of a conversation about a matter of public concern. But when you get into anything that is ambiguous, then I'm with Judge Smith. And I think that the context, first of all, always matters, and the fact that part of the context is a recognized discussion of a matter of public concern. Does context include seventh grade? Of course it does, and how the seventh graders reacted. In this case, we have evidence. We don't need conjecture. You used the words predictably. You said that it matters what the administrators could reasonably predict. Can school administrators responsible for running a middle school reasonably predict the response of seventh graders to a message that includes a sexual message? It depends on the facts in that school district. I'm going to refer the Court again to Sipniewski, where the administrators unreasonably drew a connection between words that had caused problems in the school and a word that had not caused problems in the school. And this Court found that to be an unreasonable conjecture. I will also say that in this case, we don't have a question of a reasonable projection, because we have the experience of the bracelets being in the school for two months without any complaints about this kind of a reading reaching the administrator. And that's why you argue that boobies is innocuous, because you're looking at the record and saying because there wasn't disruption in any way, there wasn't an expressed concern during those two months, therefore we know boobies is innocuous and that this deserves a different type of analysis than, say, some other substitute for boobies or breasts. No, Your Honor, I think boobies is always innocuous. Unless you put it in a really adult context, that is a word that children use to refer to breasts, and it is a word these girls use with their grandmothers, their friends, et cetera. We are not – I don't think it is reasonable. I hope we're not still talking about whether it's okay to have the word boobies in middle school. The focus of the school district's argument is on whether I heart boobies removed from its context makes this bracelet censorable. And my argument is you cannot remove it from the context, neither the context of the form nor the context of its history in the school, which this Court has always recognized as being important and necessary in the judgment of school administrators. I'm not sure I got your answer to Judge Greenaway's question. Let's be specific. If it's the T word, does your argument change? Your Honor, I don't find that word terribly shocking, but it is one of the seven dirty words that you cannot say on the radio or television. And if you can't say it on the radio or television, I'm not sure we'd argue about it being able to be used in the school. So you would concede that there is a word that will remain unspoken by me? You would concede that that would be problematic for your argument? I think that would be more problematic, certainly. Let me come back to the school is in a position, the principal, the teacher is in a position where how do they know? They see a word. Person X says, well, that word is okay. Person B says it's ambiguous. Person C says the word is not okay. What is the test that we could put into an opinion that would give the school authorities some idea as to what they can censor and what they can't censor? That's Mr. Freund's, I hope I'm pronouncing it correctly, that's his dilemma, and it's a very valid question. How do we answer that question? Absolutely. And school administrators need to have some guidance on this because right now it's wide open. That's why we get cases that say drugs suck. What's the answer? The answer is that if a word is not frankly lewd, then the school administrator needs to have some concrete and articulable reason why they believe, and now I'm paraphrasing from Morse, that the school community is going to interpret that presentation as the lewd one rather than the laudable one. And when we have a situation where the message is a matter of public concern, I don't think that any ambiguity in that can override the First Amendment rights. Should disruption figure in at all to that formula? Your Honor, while disruption is the test under tinker, disruption indicates how the school is understanding. Absolutely that matters. The student's reaction matters. If you use the T word, is there ambiguity? I find it ambiguous. I don't find that frankly lewd. Your standard of review seems more exacting than a straightforward one. Did the school administrators act reasonably or rationally? Aren't we second-guessing school administrators when we're imposing the requirements that you just articulated? Your Honor, I don't think any First Amendment test is did the school administrators act reasonably. That, in fact, was rejected in PICO and in tinker. It is always the case that while school district officials have a lot of discretion in running the school, they have a less discretion, the Supreme Court has been very clear, outside the classroom and outside the school assembly in the manner of how students talk to each other. And their discretion is always limited by the First Amendment. It's not the other way around.  So I don't think it's, while I think Fraser itself was relatively thin on guidance for school officials, I think when you read it with Morse, you find that there must be a factual basis. There must be an analysis. And I suggest this Court's approach in Sipniewski, as well as the very well-worn course of looking at content, form, and context. Was there not an articulated reason for barring the bracelets in this case? Your Honor, there were a multitude of articulated reasons. The first one's having to do with discomfort with the word boobies and discomfort with any reference to breasts. Then we heard from the school's lawyer that some students might be embarrassed by discussions of the body and that some teachers thought that these bracelets were too cutesy and not serious enough. Then somehow we go from cutesy to sexual references to women's breasts. I'm not really sure how we make that transition. Thank you, Ms. Robert. Your time is up. Judge Flicka, Judge Greenberg? No, that's all right. Okay. Thank you, Ms. Robert. Thank you, Your Honor. Mr. Freon, let's hope our colleagues will let Judge Greenaway get the first question out before we go back to where we were. Your Honor, I've been contemplating that Judge Greenaway deserves an answer. So you have the stage. What's the question? That's a good question. Now that my colleague has explained to me what you asked. Well, I think the answer, Your Honor, is that the issue is not so much the single word but the context of the sentence. I love this particular body part, which is a secondary sexual characteristic. So potentially I love breasts may be a bannable phrase in the context of, once again, a middle school. I don't think it's so much the word boobies because, as Judge McLaughlin pointed out, if you look etymologically, a boobie can be a bird, a boobie can be that, a boobie can be something else. We have the word cock on some of these. And, of course, there's the game cocks, there's cocking a gun, all kinds of things. So, I mean, that can be distorted endlessly. So what's your point? What's critical here is the ambiguity. I'm sorry, Your Honor. You were asking, I believe, Judge McKee and Judge Smith about whether you thought there was ambiguity in it. And I thought that in response to one or both of them, you said there was no ambiguity, which is confusing. No, this is not an ambiguous, Judge. This is not an ambiguous phrase. I thought you said it's a double entendre and conceded that there is inherent to a double entendre a measure of ambiguity. Well, it certainly is by the definition of double entendre. But that depends upon context, too. But everyone understood that this had a sexual meaning to it. As you listen to the questions, how could this be anything but ambiguous? Taken out of just I heart boobies, how could that be taken as anything but ambiguous? Your Honor, you could say that it is ambiguous, but the sexual meaning, I suggest, is clear to everyone, even a seventh grader. In the context of what we have here, the sexual meaning is clear? Yes, Your Honor. If you take the pejorative side of the double entendre, right? You're not saying... But I'm saying, Your Honor, if you have an ambiguity, you may or may not understand all the various potential meanings. What I'm saying is that the sexual meaning here is absolutely clear to everyone. You said there's no ambiguity. The sexual meaning in here is in... I mean, there can be sex education, there's discussion with all these words. By talking about sexual meaning, aren't you really getting away from what Frazier was talking about with lewd and obscene and offensive with the words like climax and firm? I mean, just very, very explicit use of language. You know, are you saying anything with a sexual meaning is problematic in the schools? It could be problematic in the middle school, yes. So are you saying... I mean, used to this one. I get the feeling I'm missing out on something here. I don't find the sexual meaning. I've been accused of being rather naive and prudish, but I... Not by me, Chief, not by me. I don't get the sexual meaning. I think you ought to explain yourself. Some days I just work here. I'm sorry, Your Honor. It's about breast cancer. I think you'd better explain yourself, at least to me. I'm Judge McKee. Is it your position that the words boobies in this context are lewd, vulgar, and offensive? I'm using the words that Frazier stated. They are lewd, and they possibly are offensive. They are lewd? Yes. Would you say that to a court which lost one of its dear members to breast cancer? I don't see anything offensive about that. And the fact is offensive. Having breast cancer is offensive, and it requires doing offensive things. I don't understand why you make that, take that position. Your Honor, first of all, that is not our primary position here. Our primary position is that the dress code prohibits clothing and accoutrements that have a sexual double entendre. That's what this is about. Well, who's to decide if it has a sexual double entendre? Some of my colleagues seem to have accepted that in this case, but where is the double entendre? I'm wearing one, and that's for Parkinson's, because I was in the Parkinson's session yesterday, and I picked it up, you know, paid the money and picked it up. Did you pick it up, or did you pay the money? You have a right to remain silent. That's good. Judge, I think, you know, I have a lot of school clients. Some of them did not find this. Some of them didn't ban the bracelets. Some of them did. I think going back to what I argued before is that in her approach, the district judge did not recognize any discretion and came to an almost incredible conclusion that there was no sexual meaning or could be no sexual meaning whatsoever. Our position is simply we are left at this point in time with a decision that the only guidance it gives is that if a kid comes to school with a shirt or a message or jewelry that has very colloquial references to body parts on it, that as long as they assert a defense that, you know, it's for a good cause, it can't be remedied. And that's the situation that we're in based on the decision that we have. Well, what's wrong with that position? Well, it is if you are a middle school teacher and have boys worried about the rest of the new fallen snow and can't concentrate because you're a girl and you've got one of these things on, the boy says, I love your boobies, too, which is in the record, by the way. Yeah, that's a problem. It's certainly disruptive. Time's up. He answered the question. I'm sorry you got caught in the middle. No, no, no. I don't want to get caught. So in sum, we're asking for you to reverse the lower court and give us some direction. Thank you. Thank you.